### SMITH v. LEHIGH VALLEY R. CO. OF NEW JERSEY.

(District Court, D. New Jersey. October 23, 1905.)

MASTER AND SERVANT—INJURY TO EMPLOYÉ—NEGLIGENCE OF FELLOW SERVANT.

> A mate and floatman belonging to the same crew, having the same employer, and being engaged in a common object, although of different rank, and working on different lines to accomplish the undertaking, are fellow servants, and the negligence of the mate, whereby the floatman was injured, is the negligence of his fellow servant; and neither the vessel nor its owner is chargeable with the consequences of such negligence, in the absence of evidence showing that the owner was negligent in the selection of such servant.

> [Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 492.

> Who are fellow servants, see note to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippin v. Kimball, 31 C. C. A. 286.]

(Syllabus by the Court.)

In Admiralty.

Herbert Clark Gilson and William C. Gebhardt, for libelant.
Collins & Corbin and George S. Hobart, for respondent.

CROSS, District Judge. The libel in this cause was filed for damages for personal injuries to the libelant, alleged to have been caused by the negligence of the respondent while he was in its employ as a float-

man on the 2d day of April, 1904, at Communipaw, N. J. Float No. 10, with 12 loaded freight cars thereon, was being propelled by the tug Catasaqua from pier 44, New York City, to certain bridges of the respondent, adjoining a long pier of the Central Railroad Company of New Jersey known as "Pier 1," or the "Cement Dock." The float had two tracks upon it, running longitudinally, upon each of which tracks were six cars, and between the cars was a platform seven feet wide. The tug was attached to the float about midway on its right side. The accident happened at a little after 5 o'clock in the afternoon. The ebb tide was still running, but not strongly. It was high tide by the calendar that day at Governor's Island at 9:20 in the morning, and in the evening at 9:45. This made it low water by the calendar at about 3:20 o'clock in the afternoon, but the evidence shows that at the point in question the ebb tide continues to flow for some time after it is nominally low water by the calendar. The libelant had been in the employ of the respondent for six years, and for the last four and a half years as a floatman, and during his service in that capacity had made many trips with the tug in question, and with all kinds of floats, including floats like the one above mentioned. The accident was occasioned by the movement of the tug, probably forward, which caused the quick running of a line, one end of which was attached by an eye thrown over a cleat on pier 1, and the other end of which had been passed by the floatman once or twice around a bitt on the float. The line, not having been given sufficient turns around the bitt to make it fast, paid off freely, as has been stated, with the movement of the tug and float. The libelant's leg was caught·in a loop or kink of the surplus line, which had been coiled on the deck of the float, was drawn against the bitt, and so severely injured that it had to be amputated just below the knee. The evidence shows that it was customary to enter the bridges, which were about 250 feet inside of the outer end of the pier, by approaching the pier at varying angles, depending somewhat upon the course of the tide; that, when the float came near enough to the pier for the purpose, a line was thrown over a cleat on the pier, the other end then made fast to a bitt on the float, when by action of the tug the float would be swung around toward and parallel with the pier, and thence carried forward to the bridge. There were upon the tug and float at the time of the accident the following employés of the respondent: A fireman, engineer, captain, mate, deckhand, and the libelant. The fireman and engineer were at their posts on the tug at the time, and knew comparatively little about how the accident happened. The captain was in the pilot house of the tug, steering, and signaling the engineer as to the movement of the tug and float, and, as the pilot house was not sufficiently high for him to see over the cars on the float, the mate was stationed on top of the cars, directing the libelant, and also signaling with his hands or by his voice to the captain how the tug should be managed. The evidence shows that, just prior to the accident, the tug approached pier 1 slowly and well under control; that the mate directed the libelant to pass the end of the line to a brakeman who happened to be on the pier; that the line was not passed to him in time to place its eye over the first cleat, but it was pla-

ced by him over the second cleat, some 25 feet or more further from the end of the pier towards the floating bridge which it was intended to enter. The libelant claims that his injury happened because the mate directed him to make the line fast to the bitt, to do which it was necessary that the line should be passed around it four or five times, and then, directly after he had given such order, and before the libelant had passed the line more than once or twice around the bitt, and without waiting to see that his order was executed, the mate went across the top of the cars, and gave the signal to the captain to start the tug, which was done without notice, as was customary, having been given to the libelant that the tug was to be started. The line used on this occasion was a new one, and the testimony shows that such a line, especially when wet, was more apt to kink than an older one; but of this fact the libelant must have known, or should have known, because he admitted that he had used new lines before.

It may well be questioned from the libelant's own testimony, which is, however, contradictory on the point, whether the mate was negligent in the respect above mentioned, since he testifies three or four times that, as soon as the eye was placed over the cleat on the dock, the first order given by the mate to the captain was to start the tug, and again, that this order was given to the captain before he, the libelant, was ordered to make the line fast to the bitt on the float. If such were the fact (and he ought to know whether it is or not) he could not have been caught unawares, but, on the contrary, was put on his guard by proper notice, and knew just what would naturally follow under the circumstances.

The important question in the case, however, is whether the mate was or was not at the time of the accident a fellow servant of the libelant. I think he was, and that they were both in the employment of the same master, engaged in the same undertaking, and in the discharge of duties tending to its accomplshment. In 25 Am. & Eng. Enc. of Law (2d Ed.) pp. 132, 133, the rule of law applicable to this case is laid down as follows:

"It is the duty of an owner to see that a ship is seaworthy, properly manned with competent seamen and officers, and equipped with all appliances necessary for its use and the safety of the crew. * * * Where the owner has performed his duty in the respects above mentioned, neither he nor the vessel is liable for injuries to a seaman arising from the perils of navigation or from the negligence of fellow servants."

In the paragraph immediately succeeding the above, the following statement is made:

"By the weight of authority, the master and mates are fellow servants of the seamen, and therefore a seaman who is injured by their negligence cannot recover damages against the vessel or its owner."

Cases can undoubtedly be found both for and against the proposition just stated. Some of those against it, however, have been decided upon the authority of Chicago, etc., Ry. Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787, a case appearing upon the brief of libelant's counsel. This case, however, can no longer be considered authoritative, for in New England Railroad Co. v. Conroy, 175 U. S. 323, 20 Sup.

Ct. 85, 44 L. Ed. 181, Mr. Justice Shiras, in deliverng the opinion of the court, says:

"While the opinion in the Ross Case contains a lucid exposition of many of the established rules regulating the relations between masters and servants, and particularly as respects the duties of railroad companies to their various employés, we think it went too far in holding that a conductor of a freight train is ipso facto a vice principal of the company."

And at another place he says:

"In so far as the decision in the Case of Ross is to be understood as laying it down as a rule of law to govern in the trial of actions against railroad companies that the conductor, merely from his position as such, is a vice principal, whose negligence is that of the company, it must be deemed to have been overruled in fact, if not in terms, in the subsequent case of Baltimore & Ohio Railroad v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772."

The case from which the above quotations have been taken discusses at considerable length many cases illustrative of the question as to who are, and who are not, to be considered as fellow servants, and the following rule, summarized from the text, is given in the syllabus of the case:

"An employer is not liable for an injury to one employé occasioned by the negligence of another engaged in the same general undertaking. It is not necessary that the servants should be engaged in the same operation or particular work. It is enough to bring the case within the general rule of exemption if they are in the employment of the same master, engaged in the same common enterprise, both employed to perform duties tending to accomplish the same general purposes, or, in other words, if the services of each in his particular sphere or department are directed to the accomplishment of the same general end; and accordingly, in the present case, upon the facts stated, the conductor and the injured brakeman are to be considered fellow servants within the rule."

It seems to me that the rule thus laid down controls the present case. The mate in the case at bar was a fellow servant of the floatman just as clearly as the conductor in that was a fellow servant of the brakeman. Indeed, the present case, to my mind, seems even plainer. The mate and the floatman were in the service of the same master. They were both bent upon mooring the float at the bridge; that was their common purpose, and, while the mate's share of the work was different from that of the floatman, they both contributed to its accomplishment. It is difficult to conceive of several men employed upon the same work, where at least one of them is not detailed to be on the watch or lookout, or to give directions intended to effectuate the common purpose. Men thus employed are seldom of the same rank, and engaged in identically similar duties. Several additional cases, tending to support the view I have taken, are cited below. In The Egyptian Monarch (D. C.) 36 Fed. 773, it was stated that the prevailing opinion is that, when the master is on board, his subordinate officers and seamen are fellow servants; citing numerous cases. It was likewise held in that case that a second mate, who superintends the reeling in of a hawser, is a fellow servant with a seaman engaged in turning the reel. In Olson v. Oregon Coal & Navigation Co. (D. C.) 96 Fed. 109, it was held that:

"The owners of a ship are not liable in damages for the personal injuries of a seaman, received while on a voyage, by falling or being thrown by the roll-

ing of the vessel down a hatchway, which had been left open through the negligence of a master or other officers, where a proper hatch was provided, and no claim is made of negligence in the selection of the officers."

The case of The E. B. Ward, Jr. (C. C.) 20 Fed. 702, holds that in the admiralty, no more than elsewhere, should the owner, without fault himself, be held as a general warrantor of the competency of any of his servants to the others. All are alike engaged in the common employment of navigating the ship. So, too, in the case of The City of Alexandria (D. C.) 17 Fed. 390, it was held that the navigation of a ship constitutes one common employment, for which all the ship's company are employed. Neither the vessel nor her owners, therefore, would be liable, according to the principles of the municipal law, for injuries happening to a seaman through the negligence of any of his associates in the performance of their ordinary duties; and farther on in its opinion the court says:

"Whatever negligence there was—whether in leaving the hatches uncovered, or in not notifying the libelant as he went down—was negligence on the part of those on board the ship, and in no way traceable to the owners themselves. It was neglect of the officers or men aboard in the performance of their ordinary duties; a neglect against which the owners could not possibly guard. Those who engage in a common employment take upon themselves all the natural and ordinary risks and perils incident to the performance of their duties. Among these are the perils arising from the carelessness or negligence of others who are engaged in the same employment, and it constitutes no exception to the rule that the several persons employed are not in equal station or authority, or that one servant is injured through the negligence of another who is his superior in station, to whom he owes obedience."

A similar rule is declared in The Miami (D. C.) 87 Fed. 757, in which case it appears that a boatswain was engaged with some seamen in lowering a mast, that the mate was assisting in the work, and that it was through his negligence that the boatswain was injured. The court says:

"It is not important that the offending person was the mate and the injured person was the boatswain. The boatswain had immediate charge of the work and of the three sailors detailed to do it, and in connection with such charge was lending manual aid. The mate was superintending the work from a somewhat higher post of command, and he also chose to participate in the actual work to the extent above described. But the superintendence of both mate and boatswain was quite as much a matter of operation as the manual work that both undertook to do, or, if it were otherwise, the accident was caused by the mate undertaking an operative's work. Under such a state of facts, the libelant may not recover."

In Halverson v. Nisen, Fed. Cas. No. 5,970, the negligence disclosed was that of a mate. No negligence whatever was shown on the part of the respondents, and it was not pretended that they failed to exercise due care in the selection of the mate, or that there was any carelessness or neglect in the original outfit and appointments of the vessel. The court held "that the owner of a vessel is not responsible for injuries to a seaman caused by the negligence of the mate, where no personal negligence on the part of the owner appears." See, also, Gabrielson v. Waydell, 135 N. Y. 1, 31 N. E. 969, 17 L. R. A. 228, 31 Am. St. Rep. 793, which likewise holds that the master and seaman of a vessel are fellow servants of different grades. I am constrained, therefore, to find that, if there was any negligence on the part of the mate shown

in this case, it was the negligence of a fellow servant of libelant, and is not therefore chargeable against the owners of the tug.

It was, moreover, insisted on the argument that the owners were negligent in that they furnished too small a tug for the service, and that the pilot house was too low; in other words, that the pilot house should have been sufficiently high to permit the captain to see the libelant where he was at work on the deck of the float. As to the first point, the evidence satisfies me that the tug was sufficiently powerful for the work in hand. From the captain's logbook, it appears that this identical tug, manned, so far as appears, in the same way, had been in constant use for this purpose for an indefinite time, and that in such use it had frequently taken, without difficulty and without accident, floats carrying even a larger number of cars than there were upon the float in question. It was also shown that tugs no more powerful than this was were in successful use by other railroads for the same purpose. As to the height of the pilot house, it may be said that both it and its improper construction, if any, were apparent to the libelant, and yet, so far as the case shows, he had served for a long time with this tug without complaint, in the same capacity that he held when he was injured. Furthermore, improper construction of the pilot house was not assigned in the libel as a matter of negligence. The only assignment which approximates it is that in which it is alleged that his injury was caused "by and through the fault and negligence of the Lehigh Valley Railroad Company, of New Jersey, in failing to provide, operate, and furnish a fit, suitable, sufficient, and seaworthy steam tug to properly, safely, and easily handle and control the said float while in tow, as aforesaid." This language, giving it the broadest construction, does not indicate an intention on the part of the libelant to claim that the pilot house of the tug was of an insufficient and improper height; nor, it may be added, is there any evidence in the case which shows that the tug was improperly constructed in that respect; nor again, is it at all apparent that the accident would have been avoided had the pilot house been higher; for, notwithstanding the testimony of the libelant, it does not seem possible that he could have been seen by the captain from the pilot house, working, as libelant was, on the deck of the float, near to the outer side of the cars furthest away from the tug, unless the pilot house were raised to an impracticable height. The long and successful service of this tug and of other similar tugs shows that it was not ill adapted to the use to which it was put on this occasion. Hence, I do not find, either in this or in any other respect, that there was negligence which could properly be charged to the owner of the tug and float. In view of the conclusion I have reached, it is unnecessary to point out wherein I deem the libelant was himself negligent. The injury he received is severe, and its consequences are deplorable; but, as the negligence which caused it, if any there was, was that of a fellow servant, he is not entitled to recover.

The libel will be dismissed.