## THE EGYPTIAN MONARCH.

### ROBERTS v. THE EGYPTIAN MONARCH.

*(District Court, D. New Jersey.* November 17, 1888.

**1. ADMIRALTY—JURISDICTION—CONFLICT OF LAWS.**
    A proceeding *in rem* by a seaman for personal injuries received on board an English vessel, while within English territorial waters, is governed by the law of England, though libelant is a naturalized American citizen.
**2. SAME—ENGLISH HIGH COURT—SHIPPING—PERSONAL INJURIES.**
    The jurisdiction of the high court of admiralty of England does not extend to a claim for damages by a seaman for personal injuries received on board an English ship while within the body of a county of England.
**3. MASTER AND SERVANT—FELLOW-SERVANTS.**
    A second mate, who superintends the reeling in of a hawser, is a fellow-servant with a seaman engaged in turning the reel.

In Admiralty.

Libel by John Roberts against the British steam-ship Egyptian Monarch, Royal Exchange Shipping Company, claimant, for damages for personal injury.

*A. B. Caldwell* and *Chas. Blandy,* for libelant.

*E. B. Convers,* for claimant.

WALES, J. This is a proceeding *in rem* to recover damages for injuries sustained by the libelant, a seaman on board the Egyptian Monarch, on her voyage from England to the United States, in the month of July, 1886. The libelant, a naturalized citizen of the United States, had shipped as an able-bodied seaman. The vessel left the Milward docks, in the port of London, on July 14th, being towed out into the river Thames by a tug-boat attached to a two-and-a-half inch wire hawser, which was a part of the tackle of the steam-ship, and fastened at the other end to the aft-deck of the Monarch. At the time of the accident the vessel was going down the river, but was still within the limits of the port of London. The libelant, with another member of the crew, was reeling in the hawser, which had been cast off by the tug, and triced up along-side of the Monarch. One end of the hawser was fast to the reel, a horizontal drum between two uprights, passing thence out through the after-quarter chock, and along the ship's side forward to her waist, where the other end was made fast by a hempen line to the midship davit, so that the bight of the hawser just touched the water. The second mate superintended the work of reeling. Under his direction the boatswain's mate paid out the hawser from the davit by means of the line, and the men at the reel wound it up. During this operation the hawser was paid out more rapidly than it was taken up on the drum, in consequence of which the bight sank into the water at the vessel's stern and was caught by the propeller, which reversed the motion of the drum, causing the handle at which the libelant was working to fly back, and inflict on him serious bodily injuries. The libelant alleges that the accident occurred through the negligence of the second mate, and seeks to hold the owners of the ship liable. There

is not much dispute over the facts. The ship was well equipped. There was no defect in her machinery, or in the appliances or means by which the hawser was being taken in. The second mate and the boatswain's mate were competent and experienced men, and the work in which they and the libelant were engaged, at the time of the accident, was being done in the regular course of the navigation of the ship. There was nothing unusual in the character of the work, which belonged and was incident to the ordinary duties of the officers and crew. The defenses are (1) that the accident having occurred on board of an English ship while in the territorial waters and within the body of a county of England, the law of England must govern the case, and that by that law the libelant has no lien enforceable in admiralty; (2) that both the officers who were engaged in the work with the libelant were fellow-servants of the latter, and neither the ship nor her owners are liable.

The law of the ship's home is applied by comity to regulate the mutual relations of the ship, her owner, master, and crew, as among themselves; their liens for wages, and modes of discipline. *The Brantford City*, 29 Fed. Rep. 373. And this rule will not be affected by the fact that one or more of the crew are citizens or subjects of different countries. In *The M. Moxham*, 1 Prob. Div. 107, 114, it was held (citing *Reg.* v. *Anderson*, 1 L. R. Cr. Cas. 161) that a seaman, having entered into articles to serve on board an English ship, so long as he remained on board that ship was in the same position an English subject would have been. In the celebrated case of *Phillips* v. *Eyre*, L. R. 4 Q. B. 225, 238, which was an action for assault and false imprisonment on the island of Jamaica, Lord COCKBURN, in delivering the judgment of the court on a demurrer to the plea, said:

"The rule which obtains in respect of property and civil contracts, namely, that an act, unless intended to take effect elsewhere, shall, as regards its effect and incidents, if a conflict arises between the *lex loci* and the *lex fori*, be governed by the former, appears to us to be applicable to the case of an act occasioning personal injury. To hold the contrary would be attended with the most inconvenient and startling consequences, and would be altogether contrary to that comity of nations in matters of law to which effect, if possible, should be given."

In *The Scotland*, 105 U. S. 24, 29, the supreme court of the United States held the same doctrine. Speaking through Mr. Justice BRADLEY, it said:

"In administering justice between parties it is essential to know by what law, or code, or system of laws, their mutual rights are to be determined. When they arise in a particular country or state, they are generally to be determined by the laws of that state. These laws pervade all transactions which take place where they prevail, and give them their color and legal effect. Hence, if a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it was shown what that law was."

See, also, *The Olga*, 32 Fed. Rep. 329, and Whart. Confl. Law, § 475. The *lex loci*, it is generally admitted, governs the duties, rights, and rem-

edies of seamen, unless modified by treaty stipulations. *The Belgenland,* 114 U. S. 355, 364, 5 Sup. Ct. Rep. 860; *The John Ritson,* 35 Fed. Rep. 663. In *The Maud Carter,* 29 Fed. Rep. 156, the rule of comity, as thus defined, was applied in the most liberal manner. There the libelants claimed a maritime lien against a British vessel for advances and supplies while in a British port. Under the maritime law of the United States advances and supplies of like character would not create any lien; "but," says Judge NELSON, "this vessel is a British vessel, and subject to British law. Under the circumstances it is the duty of the court to administer and apply the British law exactly as it would be applied if the vessel were in an English court. * * * As the lien would be enforced against this vessel in an English court, it can, as between the parties here, be enforced in this court."

It is clear, therefore, in the light of the authorities just cited, and which could be multiplied, if necessary, that, under the application of the rule of comity, the right of the libelant to redress must be governed by the law of England; and what that law is in relation to cases of this kind abundantly appears from an examination of the English books. The industrious research of his proctor has not produced any authority to show that the law of England has ever recognized the existence of a maritime lien for personal injuries such as are alleged to have been received by the libelant, under the circumstances and in the manner set forth in his libel. On the other side, the conclusion is successfully established that the English courts have not only ignored the creation of any lien under such circumstances, but that they have expressly denied it. In *The Public Opinion,* 2 Hagg. Adm. 398, a collision took place in the river Humber, 20 miles up from the sea, but within the body of a county. Sir CHRISTOPHER ROBINSON, J., said:

"That since the statutes of 13 Rich. II. c. 5, and of 3 Hen. VI. c. 11, it has been strictly held that the court of admiralty cannot exercise jurisdiction in civil cases, or causes of action arising *infra corpus comitatus.* * * * No case has been found to support such proceedings, and I think I can venture to say that none has occurred within a pretty long experience which I have had in the practice of this court."

This decision was rendered in 1832. The admiralty court act (1861) 24 Vict. c. 10, extending the jurisdiction of the high court of admiralty, provides, by section 7, that the said court shall have jurisdiction over any claim for *damage* done by any ship, whether within the body of a county or upon the high seas; but it has been held that the word "damage," as used in the statute, was not intended to apply to injuries done to the person, but is solely applicable to mischief done to property. *Smith* v. *Brown,* (1871,) L. R. 6 Q. B. 729; *The Vera Cruz,* 10 App. Cas. 59. Lord COCKBURN, in *Smith* v. *Brown, supra,* commenting on the distinction between damage done to property and injury to the person, says that the distinction is not one of verbal criticism, but of a substantial character, as appears from the fact that this distinctive phraseology has been observed in subsequent statutes relating to the same or analogous subjects.

On the part of the libelant it is contended that this defense is a mere question of remedy, and that he is entitled to redress in this court, irrespective of any local restriction in England. There would be force in this position if the form of action only was in dispute, but the objection to the present proceeding lies deeper, and concerns the substance of the law. This is not the case of a process of attachment to compel the appearance of a defendant. The libelant sets up a charge against the ship of a specific lien, and asks for a decree of condemnation, and sale to satisfy his claim. If he is not asserting a right of property, *pro tanto*, in the ship, he assumes the right to hold her as security for the payment of whatever damages may be awarded to him. In other words, he is suing for the enforcement of a lien which does not exist under the law of England, where his personal injuries were received, and where, if at all, the lien must have been created or recognized in order to entitle him to a decree of condemnation in this court. He may have a common-law remedy, but the proceeding here is *in rem*, and is to be treated according to the law and practice of admiralty courts, and is not a remedy afforded by the common law; it is a proceeding under the civil law. *The Moses Taylor*, 4 Wall. 431. It is only when a maritime lien arises that it can be enforced in admiralty. *The City of Panama*, 101 U. S. 462.

Who are fellow-servants? There can be no controversy over the rule —now long settled, both in this country and in England—that, where several persons are engaged in the same employment, and one of them is injured by the negligence of another, the master or employer is not liable, provided always that he is not negligent in their selection or retention, or in providing adequate materials and means for the work; it being implied in the contract of service that the servant takes upon himself the risks arising from the negligence of his fellow-servants in the same employment. *Railroad Co.* v. *Ross*, 112 U. S. 383, 5 Sup. Ct. Rep. 184; *Wilson* v. *Merry*, L. R. 1 H. L. Sc. 326; *Morgan* v. *Railway Co.*, L. R. 1 Q. B. 149. Admitting, then, that the libelant was injured through the negligence of the second mate, and that he was himself without fault, yet, if this officer was his fellow-servant, the ship and her owners are exempt from liability. It will be seen by an examination of the English cases cited and commented on by Mr. Justice FIELD, in *Railroad Co.* v. *Ross, supra*, that the second mate and libelant would be considered as fellow-servants, on the ground that they were in the same common employment, and engaged in the same common work under that common employment. Conflicting decisions on this question may be found in our own courts,—federal and state,—but numerous and respectable authorities among them classify the subordinate officers of a ship as fellow-servants with the members of the crew, who are subject to their orders. The prevailing opinion is that, when the master is on board, the subordinate officers and seamen are fellow-servants. *U. S.* v. *Huff*, 13 Fed. Rep. 630; *Halverson* v. *Nisen*, 3 Sawy. 562; *Olson* v. *Clyde*, 32 Hun, 425; *The City of Alexandria*, 17 Fed. Rep. 390; *Loughlin* v. *State*, 105 N. Y. 159, 11 N. E. Rep. 371; *Malone* v. *Transportation Co.*, 5 Biss. 315; *The E. B. Ward, Jr.*, 20 Fed. Rep. 702; *Benson* v. *Goodwin*, (Mass.) 17 N. E. Rep. 517. In *The City of Alexan-*

*dria,* and in *Malone* v. *Transportation Co.,* the court go to the extent of holding that a ship-owner is not liable for injuries received on board a vessel by one of the crew through the negligence of any of its officers, provided the ship is well equipped, and the officers are competent; this rule being founded on the principle that subordinates must be deemed to have entered upon the service with the understanding that they took their chances of negligence or carelessness on the part of others engaged in the same employment; and it is also held that the analogies of the municipal law do not always apply to accidents happening among officers and crew on shipboard. The foregoing review of the law, as applicable to the evidence, sustains both defenses, and there must therefore be a decree entered dismissing the libel.