## BERNARDO TAVARES *vs.* ARDELIA C. DEWING.

### FEBRUARY 12, 1912.

PRESENT: Dubois, C. J., Johnson, Parkhurst, and Sweetland, JJ.

*(1) Shipping. Negligence. Assumed Risks.*

Plaintiff was a foreigner ignorant of the English language. He had no knowledge of machinery and had never been on a power boat until the day preceding the injury, and then worked as an oyster shoveler. On the following day he was ordered into the cabin by the captain and commanded to bail out the water under the cabin floor. A section of the floor beneath which the shaft ran, so arranged that it could be lifted, was taken up. The water in the bilge was above the level of the shaft which was then revolving; the cabin was dark and the floor wet and slippery. The plaintiff after the orders were communicated to him by signs, was bailing the water by means of a small pail into a larger pail, kneeling on his left knee with his right leg drawn up behind him to steady him, and his right foot slipping, his leg was caught and drawn down by the shaft and injured. Plaintiff claimed that he was unable to see the shaft because of the water; that he did not know it was there and was not warned as to the dangers of the work. It also appeared that the "bilge pump" had been out of order at times during two years and was so at the time in question. It also appeared that the water could have been safely pumped out by use of a hand pump, but it did not appear that such a pump was on the boat. It further appeared that the captain filed a "wreck report" of the accident, stating that warning had been given to use great care in working around the shaft in taking out bilge water, while in motion.

*Held,* that upon such facts there was no evidence that the risk was obvious to and assumed by the plaintiff.

*Held,* further, that in view of testimony of plaintiff that he had not been warned, the introduction of the "wreck report" by him, containing a general statement by the captain, could not be taken as an admission by plaintiff that he had been warned.

*(2) Shipping. Unseaworthiness. Negligence. Vice Principal.*

*Held,* further, that the vessel leaking to the extent shown in the testimony, was unseaworthy; that the owner and the master were grossly negligent in permitting this condition to continue and in resorting to a dangerous make-shift in removing the water and that the master was grossly negligent in ordering plaintiff without proper warning or safeguard into a position of danger, and in so doing he was the representative of the owner who became liable for the injury.

*(3) Shipping. Negligence. Vice Principal.*

In cases of injury to a sailor arising from the unseaworthiness of the vessel, through the negligence of the captain, such negligence is that of a vice-principal representing the owner.

*(4)  Evidence.*

"Q. Did you see any danger there before the accident?" Held, properly excluded as not being specific.

*(5)  Evidence.  Interpreter.*

It is the function of an interpreter to interpret correctly all questions and the answers thereto, but the power to determine the responsiveness of answers belongs to the court, and instruction to an interpreter not to give answers which were not responsive to the questions, constituted prejudicial error.

*(6)  Trial.  Views.*

Where a view had been taken and plaintiff could have gone with the jury had he seen fit, the court properly exercised its discretion in refusing to interrupt the trial for the purpose of taking a second view.

TRESPASS ON THE CASE for negligence. Heard on exceptions of plaintiff and sustained.

PARKHURST, J. This is an action of trespass on the case for negligence brought by the plaintiff against the defendant, by declaration alleging in substance that the defendant on and prior to the 28th day of December, 1909, was engaged in the oyster business and owned and used for the purposes of said business a certain gasoline motor-boat; that on said day said boat was in use in said business in Narragansett Bay, and that the plaintiff, an uneducated and simple-minded foreigner, wholly unacquainted with the simplest kind of machinery or mechanism, was employed on said boat as a common laborer as a servant of the defendant; that it was the duty of the defendant to provide the plaintiff with a reasonably safe place in which and reasonably safe appliances with which to work, and by the captain to warn the plaintiff of dangers not obvious to him, and that the captain of the boat, being, as the representative of the defendant, in absolute and supreme charge and control of said boat, commanded the plaintiff to bail out from the bottom of said boat water which was leaking into said boat adjoining a rapidly revolving shaft, part of the propelling machinery of the boat; that the flooring over said revolving shaft was removed, and the plaintiff was commanded to stand upon the flooring removed, to bail out the said water; that the

flooring was slippery, and that the plaintiff in obeying said command and in the exercise of all reasonable care and caution and wholly unacquainted with the fact that he was in any danger or that the shaft was dangerous in any degree to him, slipped from the flooring against and upon said revolving shaft, his right leg was caught by said revolving shaft, badly bruised and the bones broken. The declaration further alleges, at much length, the ignorance of the plaintiff, and particularly his entire want of knowledge of machinery in general, and his entire lack of appreciation of any danger to himself in doing the bailing commanded by the captain, and that the captain wholly neglected to warn him of danger, and that the danger was not obvious to the plaintiff. The plaintiff also files a second count, in which, in addition to allegations substantially similar to those above set forth, he also alleges that he was wholly unacquainted with the English language, as the captain well knew; and that the said revolving shaft was uncovered and unprotected. The declaration also alleges in both counts in substance that the captain, before the command was given, knew, or but for want of reasonable care and caution would have known of the danger, and of the ignorance of the plaintiff, and of his entire lack of appreciation of such danger, the duty to warn him of the danger, the failure to give such warning, and that the risk was not obvious to the plaintiff.

To this declaration the defendant pleaded the general issue, and thereupon the case went to trial before a jury in the superior court, wherein, after the close of the testimony introduced on behalf of the plaintiff, the judge granted a motion for a nonsuit; upon exception to which, as well as upon other exceptions taken during the progress of the trial, the case is now before this court.

It appears from the evidence that the boat in question was owned by the defendant and was called the "Mary Lou;" that she was a vessel duly licensed under the laws of the United States, and under command of Winfield L. Sulis, as master, and was a gasoline motor-boat nearly 39 feet

long, and 14 feet wide, wherein the motive power was generated by a gasoline engine and transmitted to a screw by means of a shaft. The boat had a forward deck, open for the handling of oysters raised from the beds by a dredge,. and aft of this deck was a small cabin, entrance to which was had from the forward deck by means of a door and steps located at the port side of the forward bulkhead of the cabin-house and also by means of a door opening from a small after-deck located at the stern of the vessel. The cabin floor was somewhat lower than the level of the forward deck and the cabin-house extended some feet above said forward deck. In this cabin, in the forward part next to the cabin-bulkhead, was located the gasoline engine, and from this a shaft extended aft, beneath the cabin floor and inclined downward at such an angle as to bring the after end of the shaft in proper position for the attachment of the screw-propeller of the boat at a place in the water under the stern. A section of the cabin floor (called a "hatchway" in the testimony), beneath which the shaft ran, was so arranged that it could be lifted and laid to one side so as to give access. to the shaft and to the bilge or hollow space under the cabin floor. It appears that, at the forward part of the shaft, there was a "drum" so-called located "ahead of the hatchway" . . . "close to the engine," which "drum" . . . "encases the friction reversing gear" and is between 10 and 12 inches in diameter. It also appears clearly that. there was on the shaft at a position near the centre of the opening formed by the lifting of the section of floor or "hatchway" above described, a "coupling" about 4½ inches in diameter and about 10 inches in length and that the shaft. is in the centre of that coupling (see Horton's testimony, Trans. p. 80); and that that coupling has "holes bored through it, bored in to hold the bolt-heads, and that makes it rough."

It further appears in evidence that the plaintiff was an ignorant Portugese from the Cape de Verde Islands, who had only been in this country about two weeks, during which

time he had been engaged in farm work; that he had had no experience of machinery, and had never before been on a boat, except a sailing vessel in which he came from the islands; and that he had no knowledge of the English language, having worked only, with and for other men of his nationality; that he had worked on this boat only the one day previous to the day when he was injured, and then only on the deck, shoveling oysters; and that on that day he did not go into the cabin at all; that on the morning of December 28, 1909, he went aboard the boat, called the "Mary Lou," about 7 o'clock, and the boat proceeded down the river; that near Field's Point, the captain of the boat ordered him down into the cabin, and took up the section of the floor above referred to, laid it on the cabin floor to the left of the opening (as he faced forward), and commanded the plaintiff to bail out the water from the bilge under the cabin floor; that the water in the bilge was nearly up to the cabin floor and was above the level of the shaft, which was then revolving, the boat then being underway; that the water was foul and dirty and covered with oil; that the cabin was quite dark; that the cabin floor about the "hatchway" was wet and slippery; that the plaintiff, obeying the orders of the captain which were communicated to him by signs, he not being able to understand the captain's language, took a large pail, and also a smaller pail with which to bail the water from the hole or bilge into the large pail, and knelt down on his left knee on the board which had been taken up and placed to the left of the opening as he (the plaintiff) was facing forward, and that he then proceeded, while the captain looked on, to bail out the water with the smaller pail into the larger pail; that his right leg was drawn up behind him to steady him; that the captain watched him bail out one pail of water, and then turned away and went up into the pilot house; that almost immediately thereafter the plaintiff's right foot slipped from the board on which it was resting into the hole where the water was, his right leg was caught and drawn down by the revolving shaft into the narrow space

below the cabin floor, and the bones of his leg were crushed and broken in such a way that, after a vain attempt had been made, at the hospital, to save the leg, it was found necessary to amputate it at the knee.   The plaintiff testified that he was unable to see the revolving shaft because of the water which covered it; that he did not know there was any such revolving shaft there, that he was not warned by the captain or anyone else of any danger to himself in connection with the work he had been ordered to do.   It also appears in evidence from the captain's testimony, that the bilge-pump with which, ordinarily, this water should have been pumped out, had been out of order "off and on" for two years previous to this time, during all of which time he had been captain of this vessel; and that it was out of order at this time, and had been so on the day previous; and that he never knew whether it would work or not until he tried it; and that it had been very frequently necessary to have the water bailed out of the bilge in the same way.

It also appeared in evidence that Captain Sulis filed with the collector of customs of the port of Providence a paper called a "Wreck Report," dated January 11, 1910, in which, after stating details of accident, appear question 28 and answer, as follows:   "28.   State in detail, measures taken to avoid casualty:   28.   Warning had been given to use great care in working around engine shaft while the boat was in motion, and particularly in taking out bilge-water."   It will be noted that while this statement on the part of the captain, taken in connection with his direct testimony that the bilge-pump had been out of order "off and on" for a period of two years, *i. e.* for the whole time he had been in command, and that during that time it had been frequently necessary to have the water bailed out by hand, shows conclusively that the captain was fully aware of the danger incurred by the men under his command in so bailing out the water, it quite fails to show that he had given any warning of such danger to this plaintiff, who positively states that he had no such warning or any knowledge whatever on the

subject. It further appears in testimony that the water could have been pumped out of the bilge by the use of a hand pump about four inches in diameter, which could have been inserted into the bilge by removing the "hatchway" cover so as to leave an open space of only about six inches in width, and that the man operating the hand pump could have stood upon the transom or seat at the side of the cabin, in a place of perfect safety, so far as danger of coming in contact with the moving shaft was concerned; but it does not appear that there was any such hand pump on board at the time of the injury or at any time while Captain Sulis was in command. Such being the state of the evidence for the plaintiff, the court on motion of the defendant's attorney directed a nonsuit, based upon two grounds urged upon behalf of the defendant, *viz.*: 1. Because the risk of injury was obvious to the plaintiff and he assumed the risk; 2. Because the owner of a vessel is not responsible for the negligent acts of the captain of the vessel resulting in injury to one of the crew, and this, not on the ground that they are fellow-servants "but on the principle that where there is no right to supervise the acts of the agent then no responsibility attaches." We are of the opinion that the court below erred in directing a nonsuit. In arriving at the conclusion that the risk of injury was obvious to the plaintiff, the court below entirely misapprehended the effect of the testimony of the plaintiff, as shown in the statement by the court in granting the motion for a nonsuit; the court says: "Well, in the opinion of the court the motion of the defendant should be granted, for two reasons: the claim of the plaintiff is that he was placed in a dangerous position without being given warning of the danger of that position. If the danger was apparent, there was no necessity of giving warning. Now, the plaintiff has sworn that when he was placed in this engine room, that this section of the floor was removed, and he was directed to bail out the water that had accumulated in the bottom of the vessel and around this shaft, that he was unable to see the shaft by reason of the fact that the water was up to

the floor of the engine. He has introduced the evidence of the man who run this vessel for some months, to show that if the water was up to the engine room floor that it would flood the engine and the engine would not run. The evidence shows that the engine was running or the accident would not have happened. Now, this is a large engine, and when it was in motion, as it was then, in action, the plaintiff could not help noticing it. Instead of kneeling on the floor of this cabin between the hole in the cabin floor and the stove to bail this water, he saw fit for some reason or another to step across that hole and place his back to the engine, and he was then in a position right over the drum, where the gear that controls that crank-shaft, or revolves that crank-shaft, was encased. He could not help noticing the noise made by the engine, nor the engine itself, nor the drum, and he could not help noticing the coupling on this crank-shaft which caused this injury, because, as I say, the water could not have been so high as to cover that crank-shaft, or the engine would have stopped running. Therefore, you must hold the plaintiff to some degree of intelligence. As was suggested yesterday, a dog would know enough not to put his nose to the revolving shaft, so we must hold that a human being, no matter how old or how young they are, how low in the social scale, nor how low their degree of intelligence, we must hold them to have at least as high as a dog. Therefore, if the danger is apparent, and one is working in a dangerous place, he assumes all the risk of that danger and can not recover. There is another ground on which I think this motion should be granted, and that is this: that the owner of a vessel is not responsible for the negligent acts of the commander, of the captain of the vessel, when it results in injury to one of the crew. That is, not on the ground, as some of the cases put it, that they are fellow-servants, but on the principle that where there is no right to supervise the acts of the agents then no responsibility attaches. The captain of this vessel derived his right to run this boat, or any vessel, not from the person who employed

him, but from the authority of the United States government. He is placed in a position, when he is placed in command of a vessel, which is supreme, and nobody can at all interfere with his acts.

"The case seems to be analogous somewhat to the case of an independent contractor, where a person does work for another and is entirely independent of that other, and has a right to do that work as he sees fit, and the person for whom he works can not be held responsible for his acts.

"The motion is granted.

"Mr. Craft's exception noted."

There is no such testimony as to warrant this statement by the court. There is some slight confusion in the plaintiff's statement as to the location of the stove, which was in fact behind him as he knelt on his left knee on the left side of the hole, facing forward. He was evidently thinking of the engine, which, being in operation was doubtless hot, and which was in front of him and a little to his right, when he answered a question as to the location of the stove; and in his entire ignorance of the nature of engines and machinery he might naturally be confused by such questions regarding the stove and its location as were put to him in cross-examination. But his testimony is consistent throughout as to his position, kneeling on his left knee on the board which had been taken up and placed at the left of the hole, with his left hand supporting him in such position, his right hand using the small pail as a bailer, and his right leg drawn up to help support him in that position; and that his right foot slipped and went into the water on the left side of the hole next to him as he knelt, and that then his right leg was injured by being drawn down into the hole by the revolving shaft. There is not the slightest evidence that he was standing astride of the hole with his back to the engine, or that his leg was injured on account of his right foot slipping from that position next to the "drum," or that the "drum" had anything to do with the injury. It is rather to be inferred that, as his right foot slipped from its true position as indicated above, his leg

was caught by the "coupling" which was in or near the centre of the hole at his right and partly or wholly concealed · by water. As above shown, this "coupling" was in that position near him as he knelt. Furthermore, it is shown that this "coupling" was about 4½ inches in diameter, with the shaft in the centre of it; that the shaft was about 7 or 8 inches below the floor of the cabin; so that the circumference of this coupling would be 4 or 5 inches below the cabin floor, and might be covered with water, even if the water was not up to the cabin-floor and there is no evidence to show that if the water in the hole was high enough to cover and conceal this "coupling," or even if it was high enough to conceal the whole shaft clear up to the "drum," that it would have stopped the engine. It appears that, only when the water got up to the level of the floor 6 or 7 inches higher than the shaft, it might get into the base of the engine at the crank and stop the engine. It is plain that the mind of the court below was confused not only as to the position of the plaintiff, but also as to the effect of the testimony regarding the amount of water in the hole; and was confused also as to the "drum" and the "coupling," not distinguishing clearly between the same and their respective locations; and that the shaft and "coupling" might have been concealed by water as the plaintiff testified, without stopping the engine.

(1)　This court is of the opinion that the court below was not justified by the evidence as it stands, in finding that the risk of injury was obvious to the plaintiff, and that he assumed the risk. Nor is there any evidence that the plaintiff received any warning of the danger to be apprehended. Although the court below avoids this question in its final disposition of the case, by finding, as above shown, upon a misapprehension of the testimony, that the danger was apparent to the plaintiff, and so, that there was no necessity for a warning; yet the court in some of its remarks during the course of the trial, in relation to the introduction of the "Wreck Report" in evidence, and to the portion thereof above quoted,

apparently took the ground that the statement therein contained that "warning had been given," etc., having been introduced by the plaintiff, was conclusive evidence that he, the plaintiff, had been warned by the captain, and that such evidence could not be contradicted. It is to be noted, as above shown, that this statement does not show that the plaintiff had been warned, and is nothing more than a general statement by the captain; and its introduction by the plaintiff cannot be taken as an admission by the plaintiff that he had been warned. His testimony, as it stands, shows that he had not been warned, and there is no evidence to the contrary. As to the second ground relied upon by the court below, in ordering a nonsuit, we are also of the opinion that the same is untenable, under the evidence as above set forth. While there are some cases, to be hereinafter cited, which hold that the master of a vessel, under some circumstances, is a fellow-servant with the members of the crew, so that negligence of the master resulting in injury to a member of the crew has in such cases been held to be the negligence of a fellow-servant, thus preventing the injured person from recovering damages from the owner, yet there is another very distinct line of cases, where it is held that in cases of injury to a member of the crew arising from the unseaworthiness of the vessel through the negligence of the captain, such negligence is the negligence of the captain as a vice-principal, representing the owner.

(3)     The case of *The Osceola*, 189 U. S. 158, cited on the briefs of both parties in this case, was a libel *in rem*, filed in the District Court for the eastern district of Wisconsin, against the propeller Osceola, to recover damages for a personal injury sustained by one Shea, a member of the crew, through the negligence of the master. It appears that the vessel was bound for the port of Milwaukee, and when about three miles from port, the captain ordered the forward port gangway, which weighed upwards of one thousand pounds, to be hoisted by means of a movable derrick (ordinarily used for handling freight), in order that the vessel might be ready to

discharge cargo immediately upon arrival at her dock.
When the gangway was lifted clear, the wind caught it and
swung it around broadside to the wind, pushed it aft and
pulled the derrick over, which in falling struck and injured
the libelant. The negligence, if any, consisted solely in the
order of the master that the derrick should be used and that
the gangway should be hoisted while the vessel was yet in
the open sea where the operation might be impeded and
interfered with by the wind. There was no question of
unseaworthiness or of the lack of proper appliances for use
on board ship, and no negligence other than above set forth.
The case having been decided by the District Court for the
libelant was appealed to the Circuit Court of Appeals, and
by that court certified to the United States Supreme Court
upon questions arising upon a statement of the facts.
(p. 160: "The questions of law upon which that court
desired the advice and instruction of the Supreme Court
are—

' "First. Whether the vessel is responsible for injuries
happening to one of the crew by reason of an improvident
and negligent order of the master in respect of the navigation
and management of the vessel.

' "Second. Whether in the navigation and management
of a vessel, the master of the vessel and the crew are fellow-
servants.

' "Third. Whether as a matter of law the vessel or its
owners are liable to the appellee, Patrick Shea, who was one
of the crew of the vessel, for the injury sustained by him by
reason of the improvident and negligent order of the master
of the vessel in ordering and directing the hoisting of the
gangway at the time and under the circumstances declared;
that is to say, on the assumption that the order so made was
improvident and negligent.' "    . . .

At page 168, the United States Supreme Court, speaking
through Mr. Justice Brown, in opening its opinion, says:
"In the view we take of this case we find it necessary to
express an opinion only upon the first and third questions,

which are in substance whether the vessel was liable *in rem*
to one of the crew by reason of the improvident and negli-
gent order of the master in directing the hoisting of the gang-
way for the discharge of cargo, before the arrival of the vessel
at her dock, and during a heavy wind. As this is a libel
*in rem* it is unnecessary to determine whether the owners
would be liable to an action *in personam,* either in admiralty
or at common law, although cases upon this subject are not
wholly irrelevant."

The court having thus declined to pass upon the general
question (second) as to "whether in the navigation and
management of a vessel, the master of the vessel and the
crew are fellow-servants," proceeds to a discussion of the
general admiralty law on the subject of maritime liens for
injuries received by a member of the crew, while in the
performance of his duty; considering the ancient and modern
codes and sea laws of various countries; and in the course of
its review of numerous cases the court says as follows, pp.
173–175: "In *The Edith Godden,* 23 Fed. Rep. 43, the
vessel was held liable *in rem* for personal injuries received
from the neglect of the owner to furnish appliances adequate
to the place and occasion where used. In other words, for
unseaworthiness. This is readily distinguishable from the
previous case of *The City of Alexandria,* 17 Fed. Rep. 390,
and is in line with English and American authorities holding
owners to be responsible to the seamen for the unseaworthi-
ness of the ship and her appliances. In *The Titan,* 23 Fed.
Rep. 413, the ship was held liable to a deck hand, who was
injured by a collision occasioned partly by fault of his own
vessel. The question of general liability was not discussed,
but assumed. In the case of *The Noddleburn,* 28 Fed. Rep.
855, the question of jurisdiction was not pressed by counsel,
but merely stated and submitted. The case is put upon the
ground that, as the accident was occasioned by the master
knowingly allowing a rope to remain in an insecure condition,
the vessel was consequently unseaworthy. In *Olson* v.
*Flavel,* 34 Fed. Rep. 477, libelant was allowed to recover

damages for personal injury suffered by him while employed as mate, but if there were any negligence on the part of the respondent, it appears to have been in not providing proper appliances, so that the case was one really of unseaworthiness. , In the case of *The A. Heaton*, 43 Fed. Rep. 592, a seaman was allowed to recover consequential damages for negligence of the owners in not providing suitable appliances, although in the opinion, which was delivered by Mr. Justice Gray, he seems to assume the right of the seaman to recover against the master or owners for injuries caused by their willful or negligent acts. The case, however, was one of injuries arising from unseaworthiness, although the learned judge in his discussion does not draw a distinction between the cases arising from the unseaworthiness of the ship and the negligent act of the master. It is interesting to note that in *The Julia Fowler*, 49 Fed. Rep. 277, a seaman, employed in scraping the main mast on a triangle surrounding the mast, was allowed to recover for the breaking of the rope which held the triangle, and precipitated libelant to the deck; while in a case almost precisely similar, *Kalleck* v. *Deering*, 161 Massachusetts, 469, the owners were held not to be liable for an injury caused by the negligence of the mate in constructing the triangle and ordering the seaman to use it. In *The Frank and Willie*, 45 Fed. Rep. 494, the ship was held liable to a sailor who was injured by the negligence of the mate in not providing safe means for discharging the cargo. As the opinion was delivered by Judge Brown, who was also the author of the opinion in *The City of Alexandria*, 17 Fed. Rep. 390, the case can be reconciled with that upon the ground that the question was really one of unseaworthiness and not of negligence.

"Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following propositions:

"1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to

the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

"2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship. *Scarff* v. *Metcalf*, 107 N. Y. 211.

"3. That all the members of the crew, except perhaps the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

"4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident.

"It will be observed in these cases that a departure has been made from the continental codes in allowing an indemnity beyond the expense of maintenance and cure in cases arising from unseaworthiness. This departure originated in England in the Merchants' Shipping Act of 1876, above quoted, *Couch* v. *Steel*, 3 El. & Bl. 402; *Hedley* v. *Pinkney &c. Co.*, 7 Asp. M. L. C. 135; 1894, App. Cas. 222, and in this country, in a general consensus of opinion among the Circuit and District Courts, that an exception should be made from the general principle before obtaining, in favor of seamen suffering injury through the unseaworthiness of the vessel. We are not disposed to disturb so wholesome a doctrine by any contrary decision of our own."

In the case of *Gabrielson* v. *Waydell*, et al., 135 N. Y. 1, where the decision was that the owners of a vessel are not liable in damages for the willful and malicious acts of its master in assaulting and injuring a seaman while upon the high seas, the opinion in discussing the responsibility of owners for acts of the master uses the following language (pp. 5, 6, 7): "I concede, fully, that we should, in deter-

mining this question, be guided by the principles of the maritime law. The plaintiff's employment was, of course, a maritime contract. It is matter of familiar knowledge that about the mariner, the maritime law throws a protection greater than is extended by the general rules of the common law to him who is employed in a service upon the land. This distinction arises, very naturally, from the difference in the nature of a mariner's life and employment; which subject him to hazards and hardships and tend to make him heedless in character. So the maritime law is peculiarly solicitous of his rights and watches over his more unprotected condition. Thus, for instance, it is strict in requiring shipping articles and liberal in interpreting them for the seaman's interests, in the presence of unfair, or inadequate provisions. It obliges the owners to provide a seaworthy vessel; it requires that the vessel shall be provided with proper appliances for the seaman's safety and with adequate and proper food for his sustenance; and it imposes the duty of providing for his medical care and attendance in case of sickness or wounds. From the seaman a faithful and strict performance of his duties is required, and, because of the responsibility devolving upon the master of the vessel for the successful conduct of the voyage, considerable latitude in disciplinary powers is allowed to him; though no cruel or excessive punishment is sanctioned. In rendering to the seaman that care and in performing those duties toward him which the law exacts from the owners of the vessel, the captain for such purposes represents them and a neglect of his, in such respects, is visited upon the owners. This liability follows from the situation of the parties. The owners are not in charge of the vessel. They remain upon the land and employ a master for the vessel; as well to carry out their assumed, or implied, obligations to the members of the ship's company, as to perform the undertaking of conducting the craft successfully upon its voyage. The delegation of powers to the master of the vessel comprehends their exercise in all such ways as the safety of the vessel and the welfare of its

company render needful, or expedient. While in those respects, which demand of the owners the rendition of certain duties towards the crew, the master of the vessel must and does represent them and, by his failure or neglect, will entail consequences upon them for the breach of the obligation, he is, notwithstanding his representative and superior position, but a servant; employed with the others of the ship's company upon the vessel in the service of its owners. The scope of the service varies, as the position of the individuals employed differs; but, relatively to the general undertaking, they are fellow-servants engaged in one common employment.

"In *Scarff* v. *Metcalf* (107 N. Y. 211), which was an action by a mate against the owners of a vessel to recover damages for negligence in omitting to provide him with adequate medical attendance and care, the plaintiff's recovery was sustained in this court upon the ground that there had been a neglect of a duty imposed by the maritime law. Such a duty has always been recognized and was prescribed in the laws of Oleron and Wisbuy. What that case decided, with respect to the liability of the owners of a vessel to a seaman for a neglect of the captain, was that it existed whenever his neglect concerned something as to which a duty rested upon the owners under the principles of the maritime law; which, by force of the situation, could only be discharged through the agency of the vessel's master. Its effect is to hold that in matters relating to the owners' duty to the seaman, which the captain must perform, his neglect could not be regarded as merely that of a fellow-servant, but as the neglect of the owners."

In *Thompson* v. *Hermann*, 47 Wis. 602, the case is stated as follows: "Appeal from the County Court of Milwaukee County.

"The averments of the complaint, as amended, are thus stated by Mr. Justice Orton: 'the complaint charges, in effect, that the defendants are the owners, and one of them master, and the plaintiff, a seaman, of the vessel 'Surprise,'

sailing on Lake Erie, between the ports of Ashtabula and Erie; that while a heavy sea was running, and the vessel was pitching and rolling heavily, the jaw rope of the main gaff parted, and the gaff was unshipped, launched forward in front of the main mast, and swung over into the main rigging, and that the plaintiff, with other seamen, was ordered by the master to adjust the gaff, by standing upon the lower boom, and pulling upon the bow-line fastened to one of the horns of the jaw of the gaff, and which was very likely and apt to slip from said horn, which was very smooth, worn and slippery, and cause plaintiff to fall from said boom to the deck below, and be thereby injured, all of which was well known to the master; that the plaintiff, thinking it unsafe and dangerous to obey such order, objected and protested against the same, and informed the master, and insisted, that the main gaff could as well be adjusted by means of tackle then and there near at hand, and with safety to all concerned; but that the master refused to adopt such precautionary means, and imperatively ordered the work to be done in the dangerous way above stated; and that, in the careful discharge of his duty in obedience to such order, the plaintiff fell from said boom, and was injured, by reason of the slipping of the bowline; and that the master was grossly negligent in not providing, adopting and using the safe and proper means and appliances for such work, and in ordering and directing it to be done in the dangerous manner above stated.'

"A demurrer to the complaint, as not stating a cause of action, was sustained; and plaintiff appealed from the order."

. . .

"Orton, J. We think the amended complaint in this action states a cause of action, and that the demurrer should have been overruled.

"It is objected by the learned counsel of respondent, that the facts stated show that the service necessarily required by the employment was dangerous, and that the plaintiff, by entering upon it, took the risks and hazards upon himself,

and that he was not bound to obey orders requiring such service, and might have declined the service, and abandoned the employment, and was negligent in not so doing.

"We think that the peculiar character of the employment, and the relations existing between the master and the common seaman of a merchant vessel outside of port, remove this case from these objections and the authorities cited to sustain them; and that, although they might be correct legal propositions in respect to other kinds of employment, they have scarcely any application here. There would seem to be, however, one principle, applicable to all kinds of service, upon which this complaint might be sustained, irrespective of the peculiar character of this employment and the relation of the parties; and that is, that the master is bound to furnish safe machinery, means and appliances for the work required to be done, and that carelessness or negligence in these respects alone may be legal ground for recovery. *Smith* v. *The C., M. & St. P. R'y Co.*, 42 Wis., 525; *Wedgwood* v. *The C. & N. W. R'y Co.*, 44 Wis., 44, and many other cases in this court. But, aside from this principle, the master occupies such a position of authority on board of his vessel at sea, and the common seaman such a position of subordination, that the seaman is bound to submit to the will, judgment and discretion of the master, and obey his orders in the management of the vessel or for its repair, and especially in rough weather and on cases of emergency; and any other principle would work insubordination and the destruction of all authority and discipline on board the vessel."

The court then proceeds to cite and discuss some general principles from textbooks and cases concerning the authority of the master and the duty of the seaman in obedience to the orders of the master, and applies these general principles to the case at bar, as follows, p. 609: "The plaintiff avers that he used care, or was not in fault, in attempting with others to execute the orders of the master, and that he submitted to the judgment and authority of the master after

protest, and thus most clearly brings himself within the protection of these principles, and establishes his right of recovery. He could not have safely or lawfully done otherwise than submit under the circumstances; for his disobedience would have been revolt and mutiny, and he would have been liable to personal hazard and punishment; and to hold, under such circumstances, that he cannot recover for his personal injuries, received without any fault of his own, and solely by the careless and unreasonable orders of his superior, would be outrageously unjust. The owners of the vessel, for whom the master was acting *pro hac vice,* are liable for the injuries of the plaintiff caused by the want of skill and ordinary care in commanding such dangerous and unreasonable service."

In *Mathews* v. *Case,* 61 Wis. 491, where the court held the owners of a vessel not liable for an injury to the mate resulting from the negligence of the master, on the ground that the master was a fellow-servant with the mate engaged in a common employment, no want of proper equipment was averred. The court distinguish the case of *Thompson* v. *Hermann, supra,* saying, on p. 493: "The decision in *Thompson* v. *Hermann,* 47 Wis. 602, is relied on to sustain the action; but the facts of that case are quite dissimilar to those stated in this complaint, as was shown by defendant's counsel on the argument. That was an action by an ordinary seaman against the owners—one of whom was the master—for an injury caused by the negligence or unskilfulness of the master. There was a joint demurrer to the complaint, on behalf of all the defendants, which was sustained in the court below. This court overruled the order, holding the complaint sufficient. There the master ordered the plaintiff to adjust the rigging in a dangerous manner, though the plaintiff protested and suggested a safe way of adjusting it. But the master refused to adopt the safe course, and imperatively ordered the work to be done in a dangerous manner. The plaintiff, while in the careful discharge of his duty, obeying the master's order, fell and was

injured. It was held that the plaintiff might recover on the facts stated. The decision is placed mainly on the peculiar character of the employment, and the relations existing between the master and a common seaman of a merchant vessel outside of port. But, as we understand, the relations of mate and master are somewhat different from that the master holds to a common seaman. The mate, in some cases, exercises the functions of the master. He has more or less control in the loading and management of the vessel. It is his duty to exercise more or less superintendence over everything. It was his duty here to batten down the hatch, and in doing so to use care and discretion. He could see that the yawl-boat was not securely fastened and was liable to be thrown against him. He might have used means to prevent such an accident; but this he did not do. In any view which we have been able to take of the complaint we think it fails to state a cause of action."

In *The Julia Fowler*, 49 Fed. 277 (supra), it appeared that while the libelant, a seaman, was employed in scraping the mainmast and was sitting upon a triangle surrounding the mast, the rope holding the triangle broke, precipitating the libelant to the deck, and causing injuries, to recover for which the suit was brought. On p. 277, Brown, District Judge, says: "The evidence shows that the triangle was rigged up under the immediate direction and inspection of the mate; that the halliard was broken at a splice; that it had not been used for the same purpose before, and was unfit and insufficient to support the three men who were sent to work in the triangle in the way that it was rigged, namely, to sustain the triangle by a single line, or purchase, instead of having the line rove through the three sheaves of the block above, and the two sheaves of a block below, which would have divided the weight among five parts or purchasers of the same line. The master, who at the time was sick below, states that the line would have been sufficient had it been rigged in the latter way; and that the latter was the proper and usual mode of rigging the triangle, though it is sometimes done in

the mode used in this case. The mate's statement that he had never seen any other mode used at sea makes me discredit his testimony on all controverted points.

"It is plain that the mate was negligent in the performance of his duties in the use of such a line to rig the triangle in that manner. He ordered the use of this particular rope, and superintended the rigging of it. The defect in the line was manifest upon inspection, as it was spliced and whipped for smooth running. The negligence of the master, or chief officer who acts in the master's place, to provide safe appliances for the use of the seamen, and the deliberate use of rigging or methods plainly unsafe, affects both ship and owners with liability for the consequent damage. The chief officer was not acting in the mere capacity of a fellow-laborer, as in *Quinn* v. *Lighterage Co.*, 23 Fed. Rep. 363; *The Queen*, 40 Fed. Rep. 694, 697; *Hedley* v. *Pinkney* (1892), 1 Q. B. 58. The case is substantially the same at that of *The A. Heaton*, 43 Fed. Rep. 592, in which this rule was applied in respect to the use of a rotten gasket. See, also, *The Frank and Willie*, 45 Fed. Rep. 494. The libelant had nothing to do with preparing or rigging the triangle; but when it was ready, he was ordered aloft to work upon it, and obeyed."

See, also, *Keating* v. *Pacific Steam Whaling Co.*, 21 Wash. 415, 421, where the plaintiff, a seaman, acting under orders of captain and mate, was injured, while furling the mainsail of a vessel used in towing a barge, the tow line being attached to the mainmast and passing under the main boom in a manner dangerous to the plaintiff. Such use of the tow line was known by the officers to be dangerous to the plaintiff, and he had protested against its use, and obeyed the order to furl the sail under protest. He was held to be entitled to recover against the owners; and the case falls within the principle of other cases herein cited where owners have been held liable for injuries resulting from failure to supply and use proper and safe appliances for the business of the vessel.

(2)     We are of the opinion that the case at bar falls within the principle of the cases above cited. The "Mary Lou" was unseaworthy in that she leaked to such an extent as is shown and had no proper and safe means for removing the water from the bilge. It appeared in the evidence of the captain that the bilge pump had been out of order "off and on" for two years, during the whole time he had been in command, and that he never could tell except by trying the pump, whether it would work or not; that it had been necessary, frequently, to bail the water out from the hole, or bilge, under the cabin floor. It also appeared that the space under the cabin floor was so full of water, shortly after leaving the wharf, on the morning of the accident, that it was necessary to remove it; that it covered the shaft below the cabin floor, and, if it raised a few inches more, it was liable to stop the engine; that the bilge pump was out of order that morning and also had been out of order on the day previous, when it had been necessary to have the water bailed out. It also further appears that the necessary pumping could have been safely and easily done by a portable hand-pump, as it had been done in other cases; but it appears that not even such a pump had been furnished. Under these circumstances we are constrained to hold that the owner of the "Mary Lou" and the master as the representative of the owner were grossly negligent in permitting this unseaworthy condition to continue, and in resorting to a dangerous makeshift for the purpose of removing the water due to leakage; and that the captain of the vessel was grossly negligent in ordering the plaintiff, without proper warning or safeguard, into such a position of danger as resulted in his injury, and that in so doing the captain was the representative of the owner, and the owner became liable to answer for the injury.

We think the case at bar, both in relation to the question of assumed risk, and also in relation to the question of the owner's liability for the injury sustained, falls within the general doctrine so often followed by this court, set forth in

*Laporte* v. *Cook*, 21 R. I. 158, where the question determined related to the liability of a municipal corporation for injuries to a laborer in a sewer trench, caused by the caving of the soil, which had not been properly shored up with boards, and wherein the lower court had granted a non-suit; the court says, p. 160–161: "The conduct of the plaintiff, in going into the trench to dig the bell-holes as directed by his boss, was not, as matter of law, in view of the facts aforesaid, a negligent act. Nothing appearing dangerous to him in connection with the trench, he had the right to presume that it was reasonably safe, or, at any rate, that if there were special elements of danger, not obvious to ordinary observation, but known to his boss, he would be notified thereof. In this regard the case is materially different from *Larich* v. *Moies*, 18 R. I. 513, which is relied on by defendant's counsel. There, the plaintiff knew of the danger in question. Moreover, in that case the danger from the overhanging bank was an obvious one, and by continuing his work the plaintiff assumed the risk of being injured from the falling of the bank. In the case at bar the plaintiff did not have the advantage of the knowledge of the peculiar character of the soil, which the other workmen had acquired by digging therein, and, much less, that the bank of the trench had already caved in several places, but he was sent at once to the bottom of the trench, which was entirely new to him, to dig bell-holes, and was almost immediately buried by the caving in of the bank. Whether he was guilty of contributory negligence in such circumstances was a question of fact for the jury. *Pilling* v. *Machine Company*, 19 R. I. 666. It cannot be said as matter of law that the plaintiff assumed the risk when he was ignorant of facts on which, perhaps, a proper appreciation of the risk depended (*Breen* v. *Field*, 157 Mass. 277), although, of course, he must be held to have assumed such risks as men of ordinary observation, accustomed to such work, would have known and appreciated under the circumstances." . . .

"But the defendant's counsel contends that if there was any negligence in not having the trench properly sheathed or curbed, it was the negligence of the boss or foreman of the gang, who was a fellow-servant with the plaintiff, and hence that the city is not liable. In support of this contention he relies on *Hanna* v. *Granger,* 18 R. I. 507. That case holds that the character of the act, and not the rank of the person performing it, is the criterion of fellow service. The act in question there was the careless starting of an engine, which was the act of a servant and not the duty of a principal. The negligent act here complained of, however, is the failure of the city to furnish proper appliances for the doing of the work. This was a duty which the defendant city owed to plaintiff, and one which it could not devolve upon a servant so as to relieve itself from liability for his negligence (*Hanna* v. *Granger, supra*); and it is the failure to discharge this duty, and not the negligence of a fellow-servant, which forms the groundwork of the plaintiff's claim." See, also, for discussion of the same doctrines, *Crandall* v. *Stafford Mfg. Co.,* 24 R. I. 555, 556; *Lebeau* v. *Dyerville Mfg. Co.,* 26 R. I. 34, 36; *Hardacre* v. *Sayles,* 28 R. I. 235, 239; *Mitchell* v. *Sayles,* 28 R. I. 240; *Manzi* v. *Washburn Wire Co.,* 29 R. I. 460, 463.

The cases cited on behalf of the defendant in support of the proposition that the captain of a vessel and members of the crew are fellow-servants "as to all matters pertaining to the management and navigation of the vessel," do not apply to the state of facts as shown in the case as bar. In *Hedley* v. *Pinkney & Sons Steamship Co.,* L. R. 1 Q. B. 58 (1892), (same case on appeal, 1894 Ap. Cas. 222) it was expressly found that the ship was not "unseaworthy" under the Merchant Shipping Act, 1876, because the owners had furnished proper stanchions and rails; and the mere neglect of the captain to use them whereby loss of life occurred was not such negligence as the owners could have provided against, but was held to be the negligence of a fellow-servant. In the same class as the case last above cited is the case of

*Kalleck* v. *Deering,* 161 Mass. 469, where the court assumes in the outset "that the defendants" (owners) "did their duty in furnishing materials for the construction of the triangle, that the mate was in control of the vessel at the time, and that the cause of the plaintiff's injury was some negligence on the mate's part in constructing the triangle and in ordering the plaintiff to use it." It was held under these circumstances that the owners were not liable and a verdict for the plaintiff was set aside. The court cites *Hedley* v. *Pinkney* & *Sons Steamship Co., supra,* as one of the cases to sustain this position. See, also, *Kalleck* v. *Deering,* 169 Mass. 200, where, after another trial of the same case, in the Superior Court, and direction of a verdict there for the defendant, the plaintiff alleged exceptions; the Supreme Judicial Court, after discussing the evidence, in sustaining the exceptions, held as follows: "Whether there were planks on board the vessel which could have been got at and used, and which were suitable materials for making a triangle, we think must be considered on the evidence as in dispute. We are inclined to hold that a triangle is a thing of such simple construction that, if suitable materials were provided, it would not have been negligence on the part of the defendants not to have had a completed triangle on board as a part of the furnishings of the vessel. The burden is on the plaintiff to show that the defendants failed in their duty to provide suitable materials for making a triangle.

"We are of the opinion that the question whether there were suitable materials on board which were intended or could be used for this purpose, and which in the proper and reasonable performance of their duty the master or the mate could and should have so used, should have been submitted to the jury." This appears to us clearly to recognize the principle laid down in the above cited cases in regard to the owner's liability in cases where proper materials have not been furnished. It does not appear whether the case was ever tried again, or that it ever again came before the Supreme Judicial Court; so that the question of the ultimate

liability of the owners on the facts above suggested remains undetermined.

The remaining cases cited on behalf of the defendant upon this point, so far as they hold the master or mate of a vessel to be a fellow-servant with a seaman, show clearly a state of facts where no question of seaworthiness was involved, and where it was beyond dispute that the captain or mate was for the time being engaged in a common employment with the seaman not involving any special duty or obligation on the part of the owners, as in *Loughlin* v. *State*, 105 N. Y. 159; *Benson* v. *Goodwin*, 147 Mass. 237; *Mathews* v. *Case*, 61 Wis. 491; *Caniff* v. *Blanchard Nav. Co.* 66 Mich. 638; *The Egyptian Monarch*, 36 Fed. 773; *Livingstone* v. *Kodiak Packing Co.* 103 Cal. 258.

Upon the facts of the case, as above set forth, and upon the foregoing review of the law applicable thereto, we are of the opinion that the Superior Court erred in granting a nonsuit. The plaintiff's ninth exception is sustained.

The plaintiff's first exception relates to a question asked of the plaintiff by his attorney in his direct examination, as follows: "65 Q. Were you warned of there being any danger there of any kind whatsoever?" which was excluded, and exception taken. The exclusion was on the ground that the question was too general. Inasmuch as the very next question asked was made more specific, and elicited from the plaintiff that no warning of danger from machinery at the place where he was at work was given to him, the plaintiff takes nothing by this exception.

(4)     Plaintiff's second exception relates to the exclusion of a question asked of him by his attorney in direct examination, as follows: "69 Q. Did you see any danger there before the accident?" which was objected to as leading, and excluded by the court as not being specific, the court suggesting a more specific question. We think this question was rightly excluded, and the second exception is overruled.

Plaintiff's third exception relates to an instruction given by the court to Buncamper, who had been sworn as inter-

preter, and as such was assisting in the examination of the plaintiff, as appears from the transcript, pp. 36–8, as follows: "70 Q. (By MR. CRAFTS.) Where was the boat at the time you were hurt?  About where in the bay was it, or river?  A. I don't know where it was, because I never went there before and I don't know anything about the place.  71 Q. Ask him if he knows where Field's Point is? A. I think it was somewhere around there, but I never went there before.  THE COURT: He did not ask that question. The answer is not responsive to the question.  MR. CRAFTS. I think it is admissible.  THE COURT: He understands, certainly, how to ask the questions.  There is no better interpreter to be procured.  He knows when the answer is responsive.  MR. CRAFTS: I don't think he should pass upon the responsiveness of the questions and answers. THE COURT: I insist that he shall not answer those questions if it is not responsive.  Mr. Crafts' exception noted. THE COURT: (To the stenographer.) You may strike that out.  Mr. Crafts' exception noted to the Court's direction to strike out the answer.  THE COURT: I will take the responsibility of passing upon them, myself.  You know, yourself, that is not responsive to the question you asked.  MR. CRAFTS: I think Your Honor does not understand me.  I say it is not for the interpreter to decide whether or not the answer is responsive.  It is for Your Honor to decide on proper objection.  THE COURT: I am deciding it.  MR. CRAFTS: How can Your Honor decide it unless he translates it?  THE COURT: I have had it stricken out because it was not responsive."  This instruction given to the interpreter was manifestly improper and inasmuch as it does not appear that any further instruction was given to him on the subject, and it does appear affirmatively by his affidavit on file that he followed this instruction in the subsequent examination of the plaintiff and did not interpret all his answers, but did endeavor to get responsive answers and only interpreted such answers as he deemed responsive, it is manifest that the report of the plaintiff's testimony in the

transcript does not fully set forth all of that testimony, and it is impossible now to tell whether or not there were any important omissions. It is the function of an interpreter to interpret correctly all questions and the answers thereto, and the power to determine whether answers given by the witness are responsive belongs to the court, and must be exercised by it, and cannot be delegated to the interpreter. As the case was not allowed to go to the jury, it cannot be said that the plaintiff's case was prejudiced before the jury by the giving of this instruction. But as the case comes before this court upon exception to the nonsuit, involving the question whether or not the plaintiff had made out a *prima facie* case, it is just as important that we should have a correct transcript of the testimony as that such testimony should be correctly interpreted to the jury and the court below. We are of the opinion that this instruction to the interpreter constituted prejudicial error and the exception thereto is sustained.

The fourth exception relates to the striking out of the plaintiff's answer to question 71 on p. 36, above quoted; exception appearing on p. 37 of the transcript above quoted; it was evident that the plaintiff did not know of his own knowledge the location of Field's Point, and the answer stricken out reveals that ignorance; it was immaterial whether the answer was stricken out or not, as there was abundant evidence from other sources that the accident occurred near Field's Point; the plaintiff takes nothing by this exception.

(6)    The fifth exception is to a ruling of the court below (Tr. p. 68) refusing to grant the plaintiff's motion for a second view of the vessel. It appears that a view of the vessel had been taken by the jury after they were impanelled, but before any statement of the case had been made to them. It also appeared that there had arisen, in the course of the examination of the plaintiff, some confusion as to his position at the time he was hurt, and as to the position of various objects in the cabin. It appears that counsel for

the plaintiff contended that the plaintiff, in the course of his examination and after such confusion had arisen, should be allowed to go to the vessel with the jury and locate in their presence the place where he was when injured; and that thereby he could refresh his memory and then come back and testify. As there had already been a view, and the plaintiff could have gone with the jury, had he seen fit, and could then have refreshed his memory, we think the court had the right in its discretion to refuse to interrupt the trial for the purpose of taking a second view. The plaintiff takes nothing by this exception.

Exceptions Nos. 6 and 7 relate to questions which were immaterial and were rightly excluded, and Exception No. 8, is not pressed, as the evidence was subsequently admitted. These exceptions are therefore overruled.

The plaintiff's exceptions Nos. 1, 2, 4, 5, 6, 7, 8, are overruled; exceptions Nos. 3 and 9 are sustained; and the case is remitted to the Superior Court for the counties of Providence and Bristol for a new trial.

*A. B. Crafts*, for plaintiff.
*Littlefield & Barrows*, for defendant.

